IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROSEMARY BELAJAC**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:10cv1389 |
| | ) **Electronic Filing** |
| **MICHAEL J. ASTRUE**, | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY**, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

Plaintiff, Rosemary Belajac ("Belajac"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level.  For the reasons that follow, the motion for summary judgment filed by the Commissioner (ECF No. 13) will be denied, and the motion for summary judgment filed by Belajac (ECF No. 9) will be denied to the extent that it requests an immediate award of benefits but granted to the extent that it seeks a vacation of the Commissioner's administrative decision, and a remand for further proceedings.  The Commissioner's decision will be vacated, and the case will be remanded to him for further proceedings consistent with this opinion.

## II.   PROCEDURAL HISTORY

Belajac protectively applied for DIB and SSI benefits on February 14, 2008, alleging disability as of February 1, 2002.  R. 105, 114, 129.  The applications were administratively denied on May 29, 2008.  R. 72, 76.  Belajac responded on July 17, 2008, by filing a timely request for an administrative hearing.  R. 88.  On December 11, 2009, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge James Bukes (the "ALJ").  R. 44.  Belajac, who was assisted by a non-attorney representative, appeared and testified at the hearing.[1]  R. 48-63.  Mary Beth Kopar ("Kopar"), an impartial vocational expert, also testified at the hearing.  R. 63-66.  In a decision dated March 5, 2010, the ALJ determined that Belajac was not "disabled" within the meaning of the Act.  R. 5-17.

On April 13, 2010, Belajac filed a request for review with the Appeals Council, seeking administrative review of the ALJ's decision.  R. 4.  The Appeals Council denied the request for review on August 24, 2010, thereby making the ALJ's decision the final decision of the Commissioner in this case.  R. 1.  Belajac commenced this action on October 21, 2010, seeking judicial review of the Commissioner's final decision.  ECF Nos. 1-3.  Belajac and the Commissioner filed motions for summary judgment on March 11, 2011, and May 11, 2011, respectively.  ECF Nos. 9 & 13.

## III.   STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law.  *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision

---

[1] Non-attorneys are permitted to represent Social Security disability claimants at the administrative level.  42 U.S.C. § 406(a)(1).

is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's

4

decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

**IV.    THE ALJ'S DECISION**

In his decision, the ALJ determined that Belajac had not engaged in substantial gainful activity subsequent to her alleged onset date. R. 10. Belajac was found to be suffering from a bipolar disorder, a generalized anxiety disorder, a personality disorder, and a history of polysubstance abuse. R. 10. Although her polysubstance abuse was deemed to be "non-severe" and in remission, her remaining impairments were deemed to be "severe" within the meaning of 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii) and 416.920(c). R. 10-11. The ALJ concluded that these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). R. 11-12.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Belajac's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform only simple, repetitive tasks and simple instructions, and she must avoid anything more than simple decision making.  Additionally, the claimant must avoid crowds or groups of people, and she can have no face-to-face contact with the general public.  Further, the claimant must avoid work requiring intensive supervision, and she must avoid jobs requiring close contact with co-workers.  In addition, the claimant must avoid work involving an assembly line rate pace, while also avoiding jobs that involve changes in the work setting.  Finally, the claimant must avoid exposure to hazards such as heights and moving machinery.

R. 12. Belajac had "past relevant work"[2] experience as an administrative clerk and a telephone operator. R. 15, 64. Kopar classified those jobs as "semi-skilled"[3] positions at the "light"[4] and

---

[2] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[3] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. §§ 404.1568(b), 416.968(b).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

6

"sedentary"[5] levels of exertion.  R. 64.  Because Belajac was essentially limited to a range of "unskilled"[6] work, it was determined that she could not return to her past relevant work.  R. 15.

Belajac was born on May 17, 1960, making her forty-one years old on her alleged onset date and forty-nine years old on the date of the ALJ's decision.  R. 16, 41, 105, 114, 129.  She was classified as a "younger person" under the Commissioner's regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).  She had a high school education and an ability to communicate in English.  R. 133, 139; 20 C.F.R. §§ 404.1564(b)(4)-(5), 416.964(b)(4)-(5).  Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Belajac could work as a laundry worker, a sorter, or an addresser.  R. 16.  Kopar's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[7]  R. 64.

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[6] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."  20 C.F.R. §§ 404.1568(a), 416.968(a).

[7] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy."  *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony.  *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

V.     THE MEDICAL EVIDENCE

Between 1991 and 1998, Belajac worked as an administrative assistant for a program designed to assist female offenders in Allegheny County, Pennsylvania. R. 135. She left that job because she did not get along with a newly-hired supervisor. R. 181. Belajac's decision to leave that position was also influenced by her desire to care for her mother, who was dying of cancer. R. 181. Belajac later became a telephone operator for a private answering service. R. 135. The record indicates that she stopped working as a telephone operator on January 15, 2002. R. 134. She was apparently asked to resign after engaging in a verbal confrontation with her supervisor. R. 181. When she applied for DIB and SSI benefits, Belajac reported that the confrontation had centered on her need to care for her mother, and that she had not felt "capable of returning to work" in the aftermath of the incident. R. 134.

Belajac was hospitalized on January 1, 2006, after police officers found her lying face-down on a sidewalk in an intoxicated state. R. 137, 169. She was resistant to the officers and had to be physically restrained. R. 137. A computed tomography ("CT") scan of Belajac's brain conducted at St. Clair Hospital ("St. Clair") yielded "no evidence of recent intracranial hemorrhage." R. 172. A CT scan of her facial bones revealed no fractures. R. 173. The attending medical providers were unable to obtain Belajac's family history and subjective complaints because of her "intoxication and combative behavior." R. 169. Belajac was eventually discharged from St. Clair and instructed not to become intoxicated. R. 170. A warrant for her arrest existed at the time of her discharge. R. 170. She was apparently charged with aggravated assault and terroristic threats in connection with her altercation with the police officers. R. 202-203.

Belajac later sought treatment at Mercy Behavioral Health ("Mercy"). R. 202-395. Dr. Laura Childress-Hazen, a physician affiliated with Mercy, evaluated Belajac on January 31, 2007. R. 202-204. At the time of the evaluation, Belajac was taking no medications and had no known medication allergies. R. 203. Dr. Childress-Hazen determined that Belajac was suffering from depression, intermittent explosive disorder and polysubstance dependence. R. 203. Belajac's Global Assessment of Functioning ("GAF") was rated between 35 and 45.[8] R. 204. On October 12, 2007, Dr. Childress-Hazen opined that Belajac was "temporarily disabled," and that she would remain unable to work until June 12, 2008. R. 177.

On May 16, 2008, Dr. Sharon Wilson conducted a consultative psychological examination of Belajac in connection with her applications for DIB and SSI benefits. R. 180-184. The examination revealed that Belajac was suffering from post-traumatic stress disorder ("PTSD") stemming from a sexual assault that had occurred when she was twelve years old. R. 181-182. Dr. Wilson reported that changes, deadlines, schedules and conflicts would raise Belajac's level of anxiety. R. 183. Belajac's ability to "[t]olerate stress and pressures associated with day-to-day activities" was described as "extremely problematic." R. 183. Dr. Wilson stated that while Belajac was learning how to cope with her emotional difficulties and "able to understand, retain, and follow instructions," she was still in a "vulnerable" situation. R. 183.

Dr. Phyllis Brentzel, a nonexamining psychological consultant, opined on May 28, 2008, that Belajac's mental limitations were "moderate," and that she was capable of meeting "the

---

[8] The GAF scale "assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable to care for themselves." *Pounds v. Astrue*, 772 F.Supp.2d 713, 716, n. 2 (W.D.Pa. 2011). "A GAF rating of 45 (*i.e.*, in the range of 41 to 50) reflects 'serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).'" *Id.*, quoting the on-line version of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002).

basic mental demands of competitive work on a sustained basis." R. 185-188. Dr. Brentzel made the following remarks about Dr. Wilson's examination report:

> The examining source statements in the report concerning the claimant's abilities in the areas of making occupational adjustments and making personal and social adjustments are fairly consistent with the other evidence in file. However, the examining source statements regarding her abilities in the area of making performance adjustments are not consistent with all of the medical and non-medical evidence in the claims folder. The evidence provided by the examining source reveals only a snapshot of the claimant's functioning and is an overestimate of the severity of her limitations. Therefore, great weight cannot be given to the examining source's opinion.

R. 187. Dr. Brentzel expressed the view that Belajac could "make simple decisions," "carry out very short and simple instructions," and "maintain concentration and attention for extended periods of time." R. 187.

Dr. Jopindar Harika evaluated Belajac on September 20, 2008. R. 393-395. He reported that Belajac had a GAF score of 45. R. 395. Belajac was advised to continue with her medications and pursue psychotherapy. R. 395. Her prognosis was described as "[g]uarded." R. 395.

Belajac was examined by Dr. Mahmood A. Usman on September 3, 2009. R. 418-419. On that occasion, Belajac's speech was "clear and coherent," and her affect was "appropriate and mood-congruent." R. 418. Dr. Usman apparently believed that Belajac was not suffering from PTSD. R. 419. When Belajac returned to Dr. Usman's office on October 1, 2009, she reported that her condition had improved as a result of medication changes that had been directed by Dr. Usman. R. 414.

On November 9, 2009, Dr. Usman detailed Belajac's mental limitations in a "mental residual functional capacity questionnaire." R. 402-405. He indicated that Belajac could not "meet competitive standards" with respect to her abilities to maintain attention for a two-hour

segment, to work in coordination with (or proximity to) others without being unduly distracted, to complete a normal workday or workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to deal with normal work stress, to understand and remember detailed instructions, to carry out detailed instructions, to set realistic goals or make plans independently of others, to deal with stress associated with semi-skilled and skilled work, to interact appropriately with members of the general public, to maintain socially appropriate behavior, and to travel in unfamiliar places. R. 404-405. Dr. Usman opined that, if employed, Belajac would need to miss work "[m]ore than four days per month" because of the limitations resulting from her impairments, and that her impairments had lasted (or were expected to last) for at least twelve months. R. 405.

Dr. Usman reported on December 3, 2009, that Belajac was "doing well" on her current medication regimen. R. 409. No changes to Belajac's prescriptions were recommended. R. 409. During the course of his treatment of Belajac, Dr. Usman consistently listed her GAF score as 45. R. 409, 415, 419.

## VI. DISCUSSION

The ALJ adopted Dr. Brentzel's opinion that Belajac had no more than "moderate" mental limitations, and that she was "able to meet the basic mental demands of competitive work on a sustained basis." R. 14-15. "[L]ittle weight" was afforded to Dr. Usman's assessment,

which would have rendered Belajac "disabled" within the meaning of the Act.[9] R. 15. Belajac's arguments center on the weight accorded to the opinions of her treating sources in connection with the ALJ's residual functional capacity assessment. ECF No. 10 at 4-10.

The United States Court of Appeals for the Third Circuit has admonished that it is ordinarily inappropriate for an administrative law judge to reject the opinion of a longtime treating source solely on the basis of an assessment supplied by a nonexamining medical consultant. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008). This general guideline applies with particular force in cases involving mental limitations. *Morales v. Apfel*, 225 F.3d 310, 319-320 (3d Cir. 2000). Physicians who treat patients for physical ailments can sometimes "formulate medical opinions based upon objective findings derived from clinical tests." *Sheehan v. Metropolitan Life Insurance Co.*, 368 F.Supp.2d 228, 255 (S.D.N.Y. 2005). Psychiatrists, on the other hand, typically treat the "subjective symptoms" described by their patients. *Id.*

In this case, the ALJ appears to have relied on the opinion of a nonexamining medical consultant to reject not only the opinions expressed by Belajac's treating sources, but also an assessment supplied by a consultative examiner. R. 14-15. The precise degree of conflict between the assessments provided by Dr. Wilson and Dr. Brentzel is not clear, since Dr. Wilson did not specifically detail Belajac's functional limitations in a medical source statement. R. 180-188. Nevertheless, Dr. Wilson observed in her examination report that it would be "extremely problematic" for Belajac to tolerate the "stress and pressures associated with day-to-day activities" in the workplace. R. 183. Dr. Wilson further described Belajac as "extremely

---

[9] Kopar testified that an individual with the limitations described by Dr. Usman would not be able to perform the duties of any jobs existing in significant numbers in the regional or national economy. R. 65-66.

vulnerable." R. 183. Although Dr. Wilson identified more concrete functional abilities and limitations that were later addressed or accommodated by the ALJ's residual functional capacity determination and corresponding hypothetical questions to Kopar, the import of her examination report appears to have been that Belajac was incapable of engaging in substantial gainful activity. R. 12, 63-66, 180-184.

In light of the contrary evidence submitted by treating and examining sources, Dr. Brentzel's opinion did not constitute "substantial evidence" that Belajac could perform the duties of a full-time job. *Brownawell*, 554 F.3d at 355-357; *Morales*, 225 F.3d at 318-320. The ALJ compounded his error by failing to address Belajac's consistently low GAF scores. R. 204, 395, 409, 415, 419. The Commissioner points out that this failure, "standing alone," does not constitute a basis for setting aside the ALJ's decision. ECF No. 14 at 14; *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002). The problem with the Commissioner's argument, however, is that the ALJ's failure to discuss the low GAF scores did not "stand alone." The low GAF scores reported by Dr. Childress-Hazen, Dr. Harika and Dr. Usman were consistent with the other evidence of disability presented to the ALJ. The consistency of evidence supplied by a treating physician with remaining portions of the evidentiary record is a factor that weighs in favor of crediting that evidence. 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4).

The record indicates that Belajac was abused by her father and sexually assaulted at the age of twelve. R. 180. In her examination report, Dr. Wilson opined that Belajac was suffering from PTSD. R. 182. Dr. Wilson appears to have attributed Belajac's inability to tolerate the "stress and pressures associated with day-to-day activities" to that impairment. R. 183. Dr. Brentzel listed PTSD as one of Belajac's medically determinable impairments, indicating that it

was not sufficiently severe to warrant a finding of *per se* disability under Listing 12.06. R. 194. Dr. Usman later expressed doubt that Belajac had PTSD. R. 419.

The ALJ never mentioned PTSD in his opinion. R. 10-11. He may have discounted it because of Dr. Usman's statement negating the alleged existence of that impairment. R. 419. It is also conceivable that the ALJ considered PTSD to be encompassed within the "generalized anxiety disorder" identified in the opinion as a "severe" impairment. R. 10-11. In any event, the ALJ's failure to address this matter essentially renders his analysis beyond meaningful judicial review. *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 121-122 (3d Cir. 2000). The Commissioner's failure to account for (or properly characterize) a medically determinable impairment constitutes harmless error if the limitations resulting from that impairment are properly incorporated within the assessment of the claimant's residual functional capacity. *Rutherford v. Barnhart*, 399 F.3d 546, 552-553 (3d Cir. 2005). On the other hand, a decision denying a claimant's application for benefits cannot be affirmed where the failure to account for a medically determinable impairment may have caused the Commissioner to overlook functional limitations. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 504-505 (3d Cir. 2009). Since PTSD appears to have played a critical role in Dr. Wilson's assessment, it cannot be assumed that the ALJ's failure to address that impairment was harmless. R. 181-183. Even if the ALJ determined that Belajac did not have PTSD based on Dr. Usman's treatment note, he was still required to explain why he chose to credit Dr. Usman's opinion over that of Dr. Wilson.[10] *Reefer v. Barnhart*, 326 F.3d 376, 381-382 (3d Cir. 2003).

---

[10] Because Dr. Wilson attributed Belajac's mental difficulties to the sexual assault, the diagnosis of PTSD was not so overwhelmed by countervailing evidence that the ALJ was free to implicitly reject it without explanation. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008).

For the foregoing reasons, the Commissioner's decision denying Belajac's applications for DIB and SSI benefits is not "supported by substantial evidence." 42 U.S.C. § 405(g). The remaining question is whether an immediate award of benefits is called for, or whether the proper remedy is a remand for further administrative proceedings. A judicially-ordered award of benefits is warranted only where "the evidentiary record has been fully developed," and where "the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). That standard is not satisfied in the present case.

In order for a claimant to be "disabled" within the meaning of the Act, both his or her medically determinable impairment (or combination of impairments) and his or her inability to work must last (or be expected to last) for the statutory twelve-month period. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). On October 12, 2007, Dr. Childress-Hazen indicated that Belajac was "temporarily disabled," and that this disability was expected to last for eight months. R. 177. In a handwritten notation dated November 29, 2007, Dr. Childress-Hazen stated that Belajac had been "noncompliant" with her treatment regimen. R. 383. The Commissioner's regulations plainly provide that a claimant who, "without a good reason," fails to follow the treatment prescribed by his or her physician cannot obtain Social Security disability benefits if that treatment would restore his or her ability to work. 20 C.F.R. §§ 404.1530(a)-(b), 416.930(a)-(b). The ALJ made reference to these regulations and Dr. Childress-Hazen's treatment note in his opinion. R. 14. The Commissioner argues that Belajac's mental impairments were not disabling because they were "amenable to treatment." ECF No. 14 at 12.

The handwritten treatment note relied upon by the Commissioner is barely legible. R. 383. Although the first line of the note refers to Belajac's alleged failure to follow the treatment regimen that Dr. Childress-Hazen had prescribed, the content of the remaining lines is elusive. R. 383. Furthermore, it is not clear whether the ALJ actually relied on Belajac's noncompliance as a basis for denying her benefits, or whether he simply viewed it as one factor weighing against her overall credibility. R. 14. Nonetheless, Dr. Childress-Hazen's treatment note, when viewed in relation to her earlier prediction that Belajac would be able to work within eight months with proper treatment, counsels in favor of a remand for further proceedings rather than an immediate award of benefits. A remand will provide the Commissioner with a fresh opportunity to consider the extent to which Belajac failed to follow the recommendations of her treating healthcare providers, and the extent to which her perceived noncompliance hindered her recovery. *Sharp v. Bowen*, 705 F.Supp. 1111, 1123-1125 (W.D.Pa. 1989). The upcoming proceedings will also give the Commissioner a chance to consider whether Belajac suffers from PTSD, and whether that impairment results in functional limitations other than those recognized by the ALJ. *Diaz*, 577 F.3d at 504-506. Accordingly, the Commissioner's decision will be vacated, and the case will be remanded to him for further administrative proceedings.

**VII.  CONCLUSION**

The Commissioner's decision denying Belajac's applications for DIB and SSI benefits is not "supported by substantial evidence." 42 U.S.C. § 405(g). Several factual issues of critical importance to this case remain unresolved. Therefore, the Commissioner's motion for summary judgment (*ECF No. 13*) will be denied, and Belajac's motion for summary judgment (*ECF No. 9*) will be denied to the extent that it requests a judicially-ordered award of benefits but granted

16

to the extent that it seeks a vacation of the Commissioner's decision, and a remand for further proceedings. The decision of the Commissioner will be vacated, and the case will be remanded to him for proceedings consistent with this opinion. Belajac must be afforded "an opportunity to be heard" during the course of the upcoming administrative proceedings. *Thomas v. Commissioner of Social Security Administration*, 625 F.3d 798, 800-801 (3d Cir. 2010). An appropriate order will follow.

                                                    s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:   Kelie C. Schneider, Esquire
      Michael Colville
      Assistant United States Attorney

      (*Via CM/ECF Electronic Mail*)